IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOSE BURGOS,                         :     CIVIL ACTION
                                     :     NO. 08-1179
          Plaintiff,                 :
                                     :
     v.                              :
                                     :
PHILADELPHIA PRISON                  :
SYSTEM, et. al.,                     :
                                     :
          Defendants.                :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          January 3, 2011


## I.    INTRODUCTION

        Proceeding pro se, Jose Burgos ("Burgos") brings this

action against Philadelphia Prisons Systems,[1] Prison Health

---

[1] Philadelphia Prisons Systems is not legal entity but
instead is a department of the City of Philadelphia.  It is not a
person which may be sued under § 1983.  Thus, neither the
Philadelphia Prison Systems nor the City of Philadelphia were
properly served.  Where a plaintiff is proceeding in forma
pauperis, as Burgos is, the court must order that service be made
by a United States marshal, deputy marshal, or another
court-appointed person.  Fed.R.Civ.P. 4(c)(3).  In this instance,
"[t]he officers of the court shall issue and serve all process. .
. ." 28 U.S.C. § 1915(d).  As such, Burgos cannot be "penalized
for failure to effect service where it failed through no fault of
his own."  Young v. Quinlan, 960 F.2d 351, 359 (3d Cir. 1992),
superseded in part by statute on other grounds, 42 U.S.C. §
1997e(a), as stated in Ghana v. Holland, 226 F.3d 175, 184 (3d
Cir. 2000).  The Court will order that the City of Philadelphia
be substituted for Defendant Philadelphia Prison Systems and
properly served.

-1-

Services, Inc. ("PHS"),[2] Dr. Skliros,[3] Linda Maher, Major Osie M. Butler, Corrections Officer Jose Castro ("Castro"), and Lieutenant Lake.  Plaintiff alleges that he was denied adequate health care when he was not taken to an orthopedic surgeon for over forty days when he was suffering from a broken arm. Plaintiff claims that this delay in treatment violates his constitutional right to be free from cruel and unusual punishment as applied through the Fourteenth Amendment of the United States Constitution.

Currently before the Court are Defendants' two motions for summary judgment: (1) filed by Defendants Prison Health Services, Inc., Linda Maher, and Dr. Skliros, and (2) filed by Defendants Major Butler and Lieutenant Lake.  First, the Court will address the applicable law.  Second, the Court will apply the law to each Defendant to determine whether or not summary judgment is appropriate.

For the reasons set forth below, the Court concludes that summary judgment will be granted for Defendants Dr. Skliros, Major Butler, and Lieutenant Lake.  Meanwhile, summary judgment will be denied as to Defendants Prison Health Services, Inc. and Linda Maher.

---

[2]Originally named incorrectly in the Complaint as Philadelphia Health Services, CMD.

[3]Originally named incorrectly in the Complaint as Dr. Skliras

## II. FACTS

Below are the facts taken from Plaintiff's affidavit
and his deposition testimony as they are viewed in the light most
favorable to Plaintiff as the non moving party.  On November 3,
2005, Burgos was shot in the arm during an incident with
Philadelphia Police Officers.  (Plf.'s Dep. at 9-10.) Burgos was
treated at Albert Einstein Medical Center where a metal rod was
surgically implanted into his arm to repair the fracture by Dr.
Laurie Hirsh, an orthopedic surgeon.  (Plf.'s Dep. at 11.)
Burgos was released to the Philadelphia Prison System on November
9, 2009.  (Plf.'s Dep. at 11- 12.)

On March 8, 2006, Burgos fell from the top bunk of his
cell, causing a re-injury to his arm.  (Plf.'s Dep. at 13-14 &
17-18; Plf.'s Aff. ¶ 33.)  Burgos' cellmate helped him to the
cell block's staff desk where Castro was sitting.  Burgos
requested that he be allowed to go to "medical"[4] but Castro
denied his request.  (Plf.'s Aff. 33.)  Burgos and his cellmate
then asked the other staff member, who called Lieutenant Lake.
After seeing Burgos and his injuries, Lake granted Burgos'
request to go to Medical.  (Plf.'s Aff. ¶ 34.)

Once at medical, Dr. Skliros physically examined
Burgos.  Then, he instructed Burgos to return to his cell to

_____

[4]"Medical," meaning, the medical unit where inmates are seen
by Prison Health Services ("PHS") staff.

retrieve his identification card. A staff member unlocked his cell so that he could get his card but Castro tried to close the door before Burgos could exit. Burgos put his foot in between the door and the frame to block Castro from closing the door. Burgos began to leave and Castro then pinned him and his injured arm in the door frame, causing Burgos pain. (Plf.'s Aff. ¶ 39.)

An x-ray of Burgos' arm was taken the next day, March 9, 2006, revealing that he had fractured it. (Plf.'s Dep. at 26, 31.) Dr. Skliros wrote a referral for Burgos to go back to Albert Einstein for surgery because it was important for the continuity of care for Burgos to return to the orthopedic surgeon who had originally operated on his arm, stating that "it had to be done immediately." (Plf.'s Dep. at 35.)

Dr. Skliros sent this referral to Linda Maher, who then forwarded it to Dr. Kalu, Regional Medical Director, who approved it on March 9, 2006. Dr. Skliros also prescribed a sling for Burgos, which he did not receive until after March 17, 2006. (Plf.'s Aff. ¶ 40 & 41.) At the time of Burgos' injury there was a contract dispute between the City of Philadelphia and Albert Einstein which caused Albert Einstein to suspend services to inmates until these contract matters were resolved. (Kalu Aff. ¶ 16.)

On March 16, 2006, Burgos complained of bruising and possible internal bleeding in his broken arm. On March 17, 2006,

Dr. Skliros saw Burgos again and noting that Burgos had not yet received the sling he had prescribed, he re-ordered it.  (Kalu Aff. at 20.)  On March 19, 2006, Burgos told a Sergeant Anderson that his arm was black and red.  Anderson notified Defendant Major Butler.  (Plf.'s Aff. at 27.)  Burgos was seen by a nurse practitioner and Dr. Skliros who immediately sent Burgos to the Frankford Hospital Emergency Room to rule out deep vein thrombosis.  Burgos was then transferred to the Prison Health Services Wing (PHSW) on March 20, 2006 and remained there until March 27, 2006, when he requested to be placed back in general population.  (Plf.'s Dep. at 43 and 51.)

On March 21, 2006, Dr. Smith examined Burgos and ordered Burgos warm compresses.  Smith also issued Burgos a pass to receive extra blankets and pillows to assist him in elevating his arm for comfort.  (Plf.'s Dep. at 22.)  Burgos was not given these items so on March 22, 2006 he went to retrieve them on his own from a closet.  Corrections Officer Fallen told him to put the items back in the closet and that Burgos could not have them.  Then, Corrections Officer Brian ordered him to "lock it up," meaning to return to his cell and shut the door so that it could be locked with him inside.

When Burgos responded by telling Brian that he should not have to because he did nothing wrong, Brian began throwing Burgos' personal items into the hallway.  When Burgos again

refused to "lock it up" until after he retrieved his items, both Brian and Fallen physically grabbed Burgos, pinned his arms behind his back, and handcuffed his wrists. Burgos alleges that both Fallen and Brian were aware of his broken arm. Fallen and Brian held Burgos pinned down by his back while Burgos was "screaming" and "crying" on the floor of his cell floor because of the pain, when Corrections Officer Rivera sprayed Burgos' face with mace. (Plf.'s Aff. at 13-16.)

On or about March 24, 2006, Burgos' mother and step father visited him in prison. During the visit they noticed the bad bruising of Burgos' arm and that he was in a lot of pain. While in the visiting room, they had pictures taken of Burgos' arm as evidence. (Velez Aff.; Rivera Aff.; Plf.'s Dep. at 77.)

According to Burgos, he wrote many grievances concerning his lack of effective medical treatment. In response, Major Butler made arrangements for Burgos to be transferred to the Detention Center to receive treatment in the Prison Health Services Wing. (Plf.'s Dep. at 77.) Around April 5 or 6, 2009, Major Butler called Burgos to her office to discuss the grievances he had filed concerning his medical care and assisted him in completing an appeal to the Case 2:08-cv-01179-ER Document 47 Filed 10/09/09 Page 4 of 11 Commissioner. (Plf.'s Dep. at 58.) On April 19, Burgos received a letter from Commissioner King in response to his grievance appeal filed April 6, 2006

informing him that he would be taken to Albert Einstein the following day. (Id.)

Burgos was taken to Albert Einstein and examined by a doctor at that facility on April 20, 2006. The same orthopedic surgeon that operated on Burgos before, Dr. Hirsh, examined Burgos and asked the corrections officers that escorted him why he had not been brought in earlier. X-rays were taken that showed that the bone was re-healing over the rod. She told Burgos that he had the option of undergoing a surgery where his arm would be re-broken and there would be a chance that he would permanently lose all feeling in his arm. The alternative, Dr. Hirsch explained, was to leave his arm as it was with permanent limited mobility. Burgos chose not to have the surgery. (Plf.'s Dep. at 60.)

## III.  PROCEDURAL BACKGROUND

Pro se Plaintiff, Jose Burgos, filed this § 1983 action against the Philadelphia Prison System, the Prison Health Services, Inc. and individuals associated with those institutions, including Dr. Skliros,[5] Linda Maher, Major Osie M. Butler, C/O Castro, and Lieutenant Lake, alleging these Defendants violated his constitutional rights by failing to

_____

[5]Dr. Skliros "no longer resides in the United States, has not been served, and has asserted failure to serve as a defense." (Defs.' Opp. at 2, Doc. no. 39.)

provide adequate medical treatment for his broken arm while he was incarcerated at the Curran Fromhold Correctional Facility ("CFCF").

In September 2008, this case was placed in civil suspense to accommodate Plaintiff as he made the transition from imprisonment to parole. (Doc. no. 21.) In December 2008, after a status and scheduling conference with the parties, this case was returned to the active docket. At that time, Defendants were instructed to take Plaintiff's deposition and to file any motions for summary judgment by February 13, 2009.

On February 13, 2009, Defendants filed a motion to dismiss for lack of prosecution, arguing that they had been unable to take Plaintiff's deposition, or otherwise proceed with the case, because Plaintiff had absconded from a halfway house and was a fugitive. (Doc. no. 24.) On March 24, 2009, Plaintiff filed a motion seeking leave to reschedule his deposition to a later date. The Court granted Plaintiff's motion, and directed Defendants to reschedule Plaintiff's deposition. (Doc. no. 29.) Defendants' motion to dismiss for lack of prosecution was denied as moot. (Doc. no. 30.)

On May 19, 2009, the Court granted Defendants' motion for leave to take Plaintiff's deposition, and directed the Warden at the State Correctional Institution at Forest to produce Plaintiff for a deposition. (Doc. no. 35.)

On October 9, 2009, Defendants Prison Health Services, Inc. and Linda Maher moved for summary judgment. (Doc. no. 46). On the same day, Defendants Butler and Lake also moved for summary judgment. (Doc. no. 47.) Requests for extensions of time were granted and Plaintiff responded on February 22, 2010. (Doc. no. 58.) Defendants Prison Health Systems replied on March 23, 2010. (Doc. no. 59.) Defendants' Motions for Summary Judgment are currently before the Court.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts proffered by the non moving party as true and considers the facts

in the light most favorable to the non-moving party.  "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party."  Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)).  While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).


## V. DISCUSSION

A. § 1983 Standard

To state a claim under 42 U.S.C. § 1983 a plaintiff must allege sufficient facts to show that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived him of rights, privileges, or immunities secured by the Constitution of laws of the United States.

Here, Defendants do not deny that they were acting

under color of state law.[6]  Additionally, Burgos' claim that they failed to provide him constitutionally required medical care is an alleged violation of his rights under the Fourteenth Amendment.[7]

## B. Fourteenth Amendment Claim[8]

A pretrial detainee may assert a claim of deliberate indifference under the Due Process Clause of the Fourteenth Amendment.  See Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979). Because the Eighth Amendment provides the minimum standard for determining the rights of a pretrial detainee, City of Revere v. Mass. Gen. Hop., 463 U.S. 239, 244 (1983), the standard for deliberate indifference under the Eighth or Fourteenth Amendment is the same, Simmons v. City of Phila., 947 F.2d 1042, 1067 (3d Cir. 1991).

The Eighth Amendment, through its prohibition of cruel

---

[6]It is well established that private entities that contract with municipalities to provide services to prison inmates, as well as employees of those entities, are acting "under color of state law."  See West v. Atkins, 487 U.S. 42, 55 (1980) (physician under contract to provide medical services at prison acted under color of state law).

[7]Burgos' claim falls under the Fourteenth Amendment instead of the Eighth Amendment because he was a pretrial detainee at the time.

[8]Although Burgos seems to assert an excessive force claim against Corrections Officer Castro and the Philadelphia Prisons Systems, these Defendants have not moved for summary judgment so the Court will not address Burgos' excessive force claim.

and unusual punishment, imposes a duty on prison officials to provide humane conditions of confinement, including adequate medical treatment.  Estelle v. Gamble, 429 U.S. 97, 103-04 (1976).  A violation of the Amendment occurs when (1) a medical need is serious, and (2) the acts or omissions by prison officials demonstrate "deliberate indifference" to the inmate's health or safety.  See id. at 104-06; Monmouth County Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

For the first element of the Estelle test, the Third Circuit has defined a serious medical need as: (1) "one that has been diagnosed by a physician as requiring treatment;" (2) "one that is so obvious that a lay person would recognize the necessity for a doctor's attention;" or (3) one for which "the denial of treatment would result in the unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss." Atkinson v. Taylor, 316 F.3d 257, 272-73 (3d Cir. 2003) (internal quotations and citations omitted); see also Lanzaro, 834 F.2d 326 at 347.  In this case, Burgos had a serious medical need as his arm was broken and the metal rod in his armed was displaced by the injury.  Indeed, his treating physician, Defendant Dr. Skliros determined that Burgos' medical need was serious, referring Burgos to an orthopedic surgeon for immediate surgery for this injury.

The second element of the Estelle test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need.  See Natale, 318 F.3d at 582.  In Farmer v. Brennan, the Supreme Court explained that the term "deliberate indifference" lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other."  511 U.S. at 836.  The Court instructed that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety."  Id. at 837.  That is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id.

However, a claim that a doctor or medical department was negligent does not state a claim for medical mistreatment under the Eighth Amendment.  Id. at 106.  Also, mere disagreement as to the proper medical treatment will not support a claim under the Eighth Amendment.  Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004).  Courts will "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment."  Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (citations omitted).

Instead, the deliberate indifference standard requires

"obduracy and wantonness," Whitley v. Albers, 475 U.S. 312, 319 (1986), which has been likened to conduct that includes recklessness or a conscious disregard of a substantial risk of serious harm. See Rouse, 182 F.3d at 197. Accordingly, when some medical care is administered by officials, even if it arguably falls below the generally accepted standard of care, that medical care is often sufficient to rebut accusations of deliberate indifference. Prison officials and doctors will be given wide latitude to address the medical needs of inmates and "it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).

Where a prisoner argues that the defendants failed to provide adequate medical treatment, deliberate indifference can be shown by a prison official "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 104-05; see also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). The Third Circuit has held that deliberate indifference exists where a prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment for non-medical reasons; or (3) prevents a prisoner from receiving needed or recommended

treatment.  See Rouse, 182 F.3d at 197.

Additionally, the Third Circuit has held that prison officials are show deliberate indifference where needless suffering results from the denial of simple medical care, which does not serve any penological purpose.  Atkinson, 316 F.3d at 266; Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993); White v. Napoleon, 897 F.2d 103 (3d Cir. 1990).  Deliberate indifference also exists where "prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment."  Lanzaro, 834 F.2d at 346; Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993); White v. Napoleon, 897 F.2d 103 (3d Cir. 1990).[9]

C. Application by Defendants

Accepting Burgos' well pleaded facts as true and after drawing all reasonable inferences in Burgos' favor, the Court

---

[9]Defendants also argue in the alternative that even if liable, they were not the cause of Burgos' permanent damage to his arm or his pain and suffering.  In Hedges v. Musco, the Third Circuit held that a "§ 1983 action, like its state tort analogs, employs the principles of proximate causation," and explained that "'[t]o establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the [defendant's action] and the specific deprivation of constitutional rights at issue.'"  Burgos easily satisfies a showing that the delay in his surgery caused, at a minimum, some pain and suffering.  Indeed, he received pain medication, was prescribed pillows for comfort, and there are many grievances documenting the pain he was continuing to feel.

analyzes each Defendant separately to determine whether there is a genuine issue of material fact from which a reasonable jury could find the particular Defendant liable.

1- Prison Health Services, Inc.

An entity such as PHS may be liable under § 1983 only if it adopted a policy or custom that deprived Burgos of his constitutional rights.  Monell v. Department of Social Servs. of New York, 436 U.S. 658 (1978); Natale v. Camden County Corr. Facility, 318 F.3d 575, 583 (3rd Cir. 2003) (applying Monell to Prison Health Services).  First, the Court will determine whether or not PHS's actions, as alleged by Burgos, constitute a policy or custom.  Second, the Court determines whether or not that policy or custom, as alleged and viewed in the light most favorable to Burgos, violates Burgos' constitutional rights.

First, the Court determines whether or not a policy or custom existed in this case.  "Not all state action rises to the level of a custom or policy.  A policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict."  Natale, 318 F.3d at 584.  "A custom is an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'"  Id. (quoting Bryan County, 520 U.S. at 404).

The Third Circuit has identified "three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983." Natale, 318 F.3d at 584.

> [1] The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. [2] The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. [3] Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

> Id. (internal quotations and citations omitted).

Here, Burgos does not specifically point to a policy or custom that constitute a constitutional violation. However, as the Court reads pro se filings liberally, the facts alleged must be carefully analyzed to see if any such policy or custom exists.

In this case, the alleged constitutional violation is most like the third scenario where the Third Circuit applies municipal liability. In the third scenario, the policymaker has failed to act where the existing practice is likely to result in the violation of constitutional right. PHS followed its policies and procedures for the approval of Dr. Skliros' referral to an

orthopedic surgeon at Albert Einstein.  Dr. Skliros made his referral, Defendant Maher sent his referral to Kalu who approved it.  Then, PHS staff attempted to make an appointment.

However, according to Burgos, PHS knew that its phone calls to Einstein to schedule an appointment went unanswered because of a contract dispute between the City of Philadelphia and Albert Einstein.  Burgos also alleges that PHS knew that he had a broken arm that was going untreated despite their own physician's referral for immediate surgery.  A reasonable juror could find that PHS knew that its usual policy or practice was not effective because of this contract dispute but did nothing (that has been alleged) to alter the practice or policy.  They did not make a decision to act when it was obvious that the current policy was ineffective as it was resulting in over a forty day delay for what their physician deemed as a need for immediate surgery.

These facts, as alleged, raise a genuine issue of material fact as to whether PHS's actions qualify as a policy for municipal liability.  PHS's policymakers cannot hide behind the excuse that they followed their procedures by referring Burgos to Albert Einstein when they knew that he was not being seen for a serious injury in which their own medical staff stated required immediate surgery.  Thus, because PHS's actions, as alleged, qualify as a policy, municipal liability may apply.

Second, the Court will determine if the facts alleged raise an issue of material fact as to whether or not Burgos' constitutional rights were violated. This case is unlike the many unsuccessful cases where prisoners challenge the chosen treatment prescribed by the medical staff. Here, it was PHS's own physician that concluded, in his medical opinion, that Burgos needed immediate referral to the orthopedic surgeon at Albert Einstein for surgery. Defendant PHS does not offer any showing that Dr. Skliros' medical opinion changed.

Further, the Third Circuit has found constitutional violations under the deliberate indifference standard where medical care is delayed for non-medical reasons. Here, under the facts alleged, Burgos' medical care was significantly delayed by over forty days. Although Dr. Skliros prescribed immediate referral to Albert Einstein on March 9, 2006, Burgos did not get to Albert Einstein or to any other orthopedic surgeon until April 20, 2006. During this time he filed grievances, inquired about delays, and suffered pain as described in the record. This delay was due to the contract dispute with Albert Einstein, not for any medical reasons.

There is evidence in the record that PHS knew of this medical need (indeed, a PHS doctor prescribed it and multiple high level staff approved the referral) and the inference can reasonably be drawn that PHS knew that leaving a broken arm

untreated creates a serious risk of harm.  Under these circumstances, there is an issue of fact as to whether policymakers at PHS knew of Burgos' serious medical need but did nothing to address it.  The Court finds that PHS's policy to ignore the situation and leave Burgos with a broken arm and a dislocated rod, as alleged by Burgos, violated his right to be free from cruel and unusual punishment.

PHS may be held liable under the theory of municipal liability because there is a genuine issue of material fact as to whether or not there was a policy and if that policy violated Burgos' constitutional rights.  Thus, summary judgment is denied as to Defendant Prison Health Services, Inc.


### 2- Individual Defendants

In § 1983 claims, individuals cannot be held vicariously liable for the actions of others.  See <u>Parratt v. Taylor</u>, 451 U.S. 527, 537 n.1 (1981).  Instead, individuals must be personally involved in the alleged violation of plaintiff's rights.  See <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988).

#### a) Dr. Skliros

First, Defendant Skliros argues that summary judgment should be granted in his favor on the merits.  Dr. Skliros examined Burgos the day of his injury on March 8, 2006.  He also

ordered x-rays and referred Burgos to get immediate surgery by an orthopedic surgeon at Albert Einstein, a referral approved by March 9, 2006. Burgos does not allege that Dr. Skliros had anything to do with PHS's delay of Dr. Skliros' referral. As the Court's role is not to second guess a course of treatment prescribed by a medical professional, and because Dr. Skliros' actions in immediately examining and subsequently referring Burgos to Albert Einstein, the Court concludes that Dr. Skliros' actions do not manifest deliberate indifference. While it is clear that Dr. Skliros knew of Burgos' serious medical needs, Dr. Skliros addressed them by treating Burgos and submitting the referral. Thus, summary judgment is granted in favor of Defendant Dr. Skliros.[10]

### b) Linda Maher

Linda Maher is the a Health Administrator for Prison Health Services, Inc. and Burgos alleges that Maher was responsible for his referral to see an orthopedic surgeon at Albert Einstein and responsible for referrals generally. After Dr. Skliros referred Burgos to Albert Einstein for surgery on his broken arm, Maher transmitted that referral to Dr. Kalu and Dr.

---

[10]Dr. Skliros argues in the alternative, that summary judgment should be granted in his favor because he was not properly served. Even if the Court found that Dr. Skliros was not properly served, the Court could not grant summary judgment in favor of Dr. Skliros on this ground because Burgos cannot be penalized for any failures to effect service where the marshal service was responsible for effectuating service.

Kalu approved the referral all in one day.

However, Burgos alleges that Maher is responsible for overseeing referrals. Maher does not assert any facts except that she transmitted the original referral to Dr. Kalu for approval. Maher does not deny that she is responsible for ensuring referrals are carried out. Nor does Maher state why she failed to get an appointment at Albert Einstein for Burgos for 42 two days except to point to the fact that "the scheduling delay was due to the dispute between Albert Einstein and the City of Philadelphia."

Maher also does not assert any facts for why she allegedly did not follow-up with Dr. Skliros regarding the referral or schedule Burgos to see an alternative orthopedic surgeon. She only asserts the opinion that the delay "was out of Maher's control." (Def. Maher Mot. Sum. Judg. at 11.) As the PHS employee responsible for referrals and aware of Burgos' situation there is an issue of fact as to whether she was deliberately indifferent by significantly delaying his medical treatment for non medical reasons.

Thus, summary judgment is denied as to Defendant Maher.

### c) Major Osie M. Butler

Mr. Burgos does not allege any facts against Defendant Butler. Indeed, the only evidence provided shows that Butler responded to a grievance filed by Burgos and recommended that he

be referred to medical for his arm.  This referral was made the day that Burgos was sent to the Frankford ER.  Burgos does not allege that he told her about the Albert Einstein referral and that she did nothing in response.  Burgos' Complaint and additional documents do not allege much of anything regarding Butler.  Further, Butler cannot be held responsible simply because she is a supervisor at the prison as there is no vicarious liability in § 1983 claims.  Thus, summary judgment is granted in favor of Defendant Butler.

### e) Lieutenant Lake

Burgos alleges that Lieutenant Lake was the Lieutenant on duty when Officer Castro refused to let Burgos go to medical for his broken arm.  He further alleges that when he told another staff member that he wanted to speak to the Lieutenant on duty about this, Lieutenant Lake met with Burgos and ordered that Burgos be allowed to go to medical.  Burgos also states that Lieutenant Lake was the Lieutenant on duty when Officer Castro subsequently grabbed and pulled Burgos by his broken arm when he returned to his cell to get his ID to bring back to medical, as instructed by Dr. Skliros.

However, Lieutenant Lake cannot be held vicariously liable for Castro's actions.  Thus, the only allegation which personally involves Lake is that when he saw Burgos and his injuries on March 8, 2006, he immediately sent him to medical.

This act certainly does not qualify as showing deliberate indifference.  Thus, summary judgment is granted in favor of Defendant Lake.

## VI. CONCLUSION

For the reasons stated above, summary judgment will be granted in favor of Defendants Butler, Lake, and Skliros. Meanwhile, summary judgment for Defendants Prison Health Services, Inc. and Linda Maher will be denied as there are genuine issues of material facts to be determined by a jury.  An appropriate order will follow.